IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| DENISE ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-03305-CV-S-REL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Denise Robinson seeks review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred in determining her residual functional capacity and relied on faulty vocational expert testimony. I find that (1) the ALJ's residual functional capacity determination was supported by substantial evidence and (2) reliance on the vocational expert testimony was not erroneous. Therefore, Plaintiff's Motion for Summary Judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

Plaintiff submitted a claim for both Social Security Disability Insurance Benefits and Supplemental Security Income Benefits on October 24, 2003. Plaintiff's alleged disability and inability to work stems from lower back and neck pain, depression, insomnia, headaches, arthritis, carpal tunnel syndrome in both wrists, and limited mobility in her right hand. Plaintiff's application

was denied on February 18, 2004. On May 17, 2005, a hearing was held before an ALJ; a supplemental hearing was also held on January 12, 2006. On April 27, 2006, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On July 17, 2006, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)(citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 2 of 52

U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998) (discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988)(discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983)(discussing burden in disability insurance benefits case).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.      Is the claimant performing substantial gainful activity?

3

Yes = not disabled.
No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of Plaintiff, vocational expert Terri Crawford, vocational expert Michael Lala, and the documentary evidence admitted at both hearings.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**1.      Earnings Record**

Plaintiff's earnings record indicates that she earned the following income:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1983 | $  440.95 | 1993 | $ 3,272.17 |
| 1984 | 43.55 | 1994 | 3,018.11 |
| 1985 | 0.00 | 1995 | 1,136.42 |
| 1986 | 1,023.30 | 1996 | 3,286.36 |

4

| 1987 | 181.00 | 1997 | 4,710.73 |
|------|--------|------|----------|
| 1988 | 0.00 | 1998 | 2,234.23 |
| 1989 | 0.00 | 1999 | 4,969.99 |
| 1990 | 0.00 | 2000 | 1,790.26 |
| 1991 | 948.12 | 2001 | 1,216.64 |
| 1992 | 969.77 | 2002 | 2,892.33 |
| | | 2003 | 4,819.61 |

(Tr. at 107, 112, 119, 133, 140).

## 2.   Disability Report

In her Disability Report, Plaintiff stated that her conditions limited her ability to function and sleep (Tr. at 146). She reported being unable to sit, stand, or lie down for periods of time (Tr. at 146). Plaintiff further reported she could not hold a job for more than a few weeks (Tr. at 146). With previous jobs, she "hardly ma[d]e it past" the probationary period, as she either got fired or could not get out of bed to go to work (Tr. at 146). Plaintiff stopped working on October 15, 2003, because she could no longer function (Tr. at 146). She stated her legs ached and swelled, her hands swelled, she experienced migraine headaches, and her elbows and lower back hurt constantly (Tr. at 146). Plaintiff indicated her depression "set in" and she was then terminated (Tr. at 146).

Previous employment as reported by Plaintiff included work as: (1) a sales clerk from May of 1983 until December of 2001; (2) a thrift store supervisor from 1995 to 1997; (3) a sales representative from 1998 to 1999; (4) an office assistant from March of 2000 until May of 2000; (5) a custodian in January of 2001; (6) a dishwasher in February of 2001; (7) a sales clerk/assistant manager in a clothing thrift store in March of 2001; (8) a sales representative in April of 2001; (9) an office assistant from April of 2001 until May of 2001; (10) a telemarketer from August of 2002 until September of 2002; (11) a sales clerk/assistant manager in a beauty supply store from October of 2002 until November of 2002; (12) a waitress in August of 2003; and (13) a laundry room worker

5

in October of 2003 (Tr. at 156, 163).

### 3. Background Questionnaire

Plaintiff reported being unable to work due to an inability to stand on her feet for more than one hour (Tr. at 171). After an hour, she stated her legs begin to swell and she is in acute pain; sometimes her right knee gives out (Tr. at 171). Sitting for a period of time caused pain in her neck and back (Tr. at 171). Typing, handling objects, repetitive movements, and maintaining concentration were difficult (Tr. at 171). Plaintiff also reported having carpal tunnel in both arms, painful swelling in her wrists and hands, anxiety attacks, hearing voices, and having a "buzzing sounds/feeling in my head" (Tr. at 172). She stated she had a hard time remembering who people were (Tr. at 171). Her conditions were aggravated by walking distances, standing and sitting for periods of time, lying down, repetitive movement in her arms and legs, and receiving criticism from supervisors and coworkers (Tr. at 171, 172).

Plaintiff reported Mobic[1] did not stop her pain and swelling if she moved around a lot (Tr. at 171). The Prolex[2] drained her sinuses and her glands became infected (Tr. at 171). She stated she used a cane regularly and wore hand/wrist braces when her elbow flared up (Tr. at 173).

When asked about various activities of daily living, Plaintiff reported never being able to use a check book, having a tendency to forget to pay bills, being unable to count change due to confusion; she stated she could complete a money order but that it would have "lots of errors" (Tr.

---

[1]Mobic is a nonsteroidal anti-inflammatory drug that is used to reduce pain, inflammation and stiffness. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04532a1;_ylt=AhYjAvV_d1fv4fy4hXXCFkokD7sF (last visited Aug. 8, 2007).

[2]Prolex "is used to treat the symptoms of the common cold and other respiratory infections." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03381a1;_ylt=AomdMEnfU.nVWkOT_P3S5twkD7sF (last visited Aug. 8, 2007).

at 173). Plaintiff further reported she was unable to: (1) do the dishes because the swelling in her hands and wrists prevented her from holding the dishes and pots; (2) make a bed and/or change the sheets, because bending over grasping the sheets was painful and she was too weak to pull the sheets and bedspread; (3) iron, as motion was painful; (4) vacuum, due to the lack of strength and pain in her back; (5) take out the trash, because lifting the bag caused pain; (6) mow the lawn, as she did not have the strength to push or pull; (7) garden, since she cannot bend on her knees; (8) bank, due to an inability to keep records; and (9) go to the post office (Tr. at 174). Lastly, she reported no longer being able to cut hair, make flower arrangements, type or work on the computer, answer phones, or write without pain (Tr. at 174).

Plaintiff no longer prepares meals (Tr. at 174). Swelling causes her to drop and break items (Tr. at 174). She reported rarely sleeping more than two hours a night for the past six months (Tr. at 174). Plaintiff stated it was difficult to do her hair because of the lack of strength in her hands; she was even unable to put her hair in a ponytail (Tr. at 174). She had a hard time getting out of the bathtub and had fallen twice (Tr. at 174).

On an average day, Plaintiff reported waking up at 2:00 or 3:00 in the morning (Tr. at 175). She sits on the edge of the bed until she can feel her legs and her arm/neck/back pain decreases enough to get up (Tr. at 175). Bathing, doing her hair, tying her shoes, and fixing something to eat fill most of her day (Tr. at 175). She can "sometimes" watch a thirty-minute television program, but cannot watch television for an hour or two hours (Tr. at 175). When Plaintiff reads, her head hurts and she has a difficult time comprehending (Tr. at 175). She drives five to ten miles one or two times a month (Tr. at 175). When she leaves her home, she is anxious to return (Tr. at 175).

Plaintiff stated she has trouble following both written and verbal instructions (Tr. at 176).

With written instructions, she looses her concentration after one line; with verbal instructions, she becomes anxious about wanting to do it correctly and forgets the instruction (Tr. at 176). She reported having difficulty getting along with others and believed others had difficulty getting along with her (Tr. at 176). She also stated people have told her they do not understand what she means when she talks (Tr. at 176).

**4.      Statement in Regard to Consultative Examination**

Plaintiff stated she did not tell Dr. Lutz about her insomnia, bipolar disorder, or anxiety (Tr. at 190). When asking her questions, Dr. Lutz simultaneously typed her responses into a computer (Tr. at 190). Plaintiff believed he "was going very fast" (Tr. at 193).

## B.  SUMMARY OF MEDICAL RECORDS

On October 21, 2002, Plaintiff reported to Cox Medical Center North with depression and suicidal ideation (Tr. at 254-260). She stated she was diagnosed with bipolar disorder approximately three years ago and, although prescribed medication, never had it filled (Tr. at 254). Since that time, her depression worsened due to financial problems and an inability to keep a job (Tr. at 254). Plaintiff reported having a college degree in business administration and computers and an associate degree in psychology (Tr. at 254). She used to drink alcohol on a daily basis but now only does so on a weekly basis (Tr. at 254). She also admitted to smoking crack as recently as one week ago (Tr. at 254-255). Plaintiff indicated she had been through drug rehabilitation and did not feel she needed it again (Tr. at 255). She was discharged that same day (Tr. at 260).

Plaintiff visited Cox Health Systems' emergency room on November 9, 2002 for pain in her right elbow (Tr. at 249-252). She reported striking her elbow on the wall three days prior and stated she began experiencing intense pain and an inability to move the night before (Tr. at 249). She

8

stopped taking Effexor XR[3] three days ago (Tr. at 249). Physical examination revealed a limited range of motion; her elbows were swollen, tender and had bony-point tenderness (Tr. at 250). Plaintiff was diagnosed with a right elbow contusion, given a sling, and prescribed Vicodin[4] and Vioxx[5] (Tr. at 251). On November 11, 2002, Plaintiff returned to the emergency room requesting a prescription, stating she had dropped the medications she received on November 9, 2002, down the sink (Tr. at 245). She was given a refill of Vicodin and Ultram[6] (Tr. at 247).

On November 26, 2002, Plaintiff saw Dr. John McMillin, M.D., for right elbow pain (Tr. at 197). She stated she was a recovered alcoholic (Tr. a 197). Plaintiff had a full range of motion and X-rays were negative (Tr. at 107). Dr. McMillin prescribed Plaintiff an anti-inflammatory and placed her in physical therapy (Tr. at 197).

Plaintiff reported to the emergency room at Cox Medical Center North on December 19, 2002 (Tr. at 240-244). She reported suffering from a headache as well as an intermittent, brief buzzing-like sensation and a mild electrical shock-type activity in her head that was associated with with a loss of balance and, at times, blurred vision (Tr. at 240-241). Current medication included Vioxx (Tr. at 241). Neurological examination revealed Plaintiff had normal Romberg[7] and finger-to-

_____

[3]Effexor XR is an antidepressant. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03181a1;_ylt =AqasPfpGvrXtI5.Y71Y3i9skD7sF (last visited Aug. 8, 2007).

[4]Vicodin is used to treat moderate to severe pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d03428a1;_ylt=AudcRV8iOKGbfw6xlwh8uEQkD7sF (last visited Aug. 8, 2007).

[5]Vioxx is a nonsteroidal anti-inflammatory drug that is used to reduce pain, inflammation and stiffness. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04433a1;_ylt=AnvW5v79bAB.gdWgpxcpNIEkD7sF (last visited Aug. 8, 2007).

[6]Ultram is a pain reliever used to treat moderate to moderately severe pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03826a1;_ylt=Ajpn4sTKcu5CtRLAu4hGDTYkD7sF (last visited Aug. 8, 2007).

[7]The Romberg test is used to detect poor balance.

9

nose testing (Tr. at 242). She also had normal and equal strength, sensation and deep tendon reflexes in all of her extremities (Tr. at 242). Plaintiff was prescribed Depakote EC,[8] 500 mg every night (Tr. at 242).

Plaintiff followed up with Dr. McMillian on January 13, 2003 (Tr. at 196). She had not been to therapy due to scheduling problems with her new job (Tr. at 196). Her right elbow was feeling better, but he was experiencing left elbow pain (Tr. at 196). Physical exam of the right elbow revealed she was less tender (Tr. at 196). Plaintiff did have some pain with passive wrist flexion with the elbow in extension; however, she was not very tender to direct palpation over the lateral epicondyle (Tr. at 196). Examination of Plaintiff's left elbow revealed some tenderness over the lateral epicondyle and a wrist flexion/elbow extension test was positive (Tr. at 196). Dr. McMillin diagnosed Plaintiff with improved right tennis elbow and symptomatic left tennis elbow (Tr. at 196). He recommended obtaining a inflammatory profile and continued her on Vioxx (Tr. at 196).

On March 18, 2003, Plaintiff presented at the emergency room at Cox Medical Center (Tr. at 236-240). She complained of a constant headache with sharp pain that had started two weeks ago (Tr. at 236). Her previous headache had been two months ago (Tr. at 236). Mood and affect were normal (Tr. at 238). Current medications included Ibuprofen[9] and Motrin;[10] these over-the-counter

---

[8]Depakote affects chemicals in the brain that may be related to seizures, migraine headaches, and manic episodes in bipolar disorder. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03833a1;_ylt= Au3qGQplqXEPKgPdS8e1wLYkD7sF (last visited Aug. 8, 2007).

[9]Ibuprofen is a nonsteroidal anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00015a1;_ylt= AhM7172y9GAGQmZQCLVUAZwkD7sF (last visited Aug. 9, 2007).

[10]Motrin is a nonsteroidal anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d00015a1;_ylt=AljBTPzBf3UR0NEKpEsPdD0kD7sF (last visited Aug. 9, 2007).

medications were not providing relief (Tr. at 236). Plaintiff was diagnosed with a headache and given a prescription for Darvocet N-100,[11] one tablet every six hours as needed (Tr. at 238-239).

Plaintiff went to the emergency room at St. John's Regional Health Center on March 19, 2003, complaining she had experienced a headache for the past week (Tr. at 204-209). She prescribed Midrin,[12] Augmentin[13] 875 mg, and Compazine[14] 10 mg every six hours as needed (Tr. at 205). Plaintiff called the hospital requesting a different pain medication on March 20, 2003, as Midrin was not covered by Medicare (Tr. at 203). Her prescription was changed to Torodol,[15] 10 mg (Tr. at 203).

On May 25, 2003, Plaintiff went to the emergency room for a headache and right jaw pain she had sustained four days earlier after falling off the roof while adjusting a satellite system (Tr. at 229). She lost consciousness for approximately one minute (Tr. at 230). Her mood and affect were normal and her extremities were non-tender (Tr. at 231). Plaintiff was diagnosed with a facial bruise and a concussion, and prescribed a pain medication (Tr. at 231-232).

On June 18, 2003, Plaintiff presented to the emergency room complaining of right elbow pain

---

[11]Darvocet is used to relieve pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03434a1;_ylt= AhzM8s4wbdWL6ktahtzxFuckD7sF (last visited Aug. 9, 2007).

[12]Midrin is used to treat tension and migraine headaches. Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d03459a1;_ylt=Ai5ZLbR2JH0oSQonOgmHdbUkD7sF (last visited Aug. 9, 2007).

[13]Augmentin is an antibiotic. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00089a1;_ylt= Ap69efa5l43UQAh4QzJUwMQkD7sF (last visited Aug. 9, 2007).

[14]Compazine is "most commonly used to treat nausea and vomiting[,] [i]t is also sometimes used to treat psychotic disorders and anxiety." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00355a1; _ylt=AkIDDCRiwFNijAsjjSP9z7IkD7sF (last visited Aug. 9, 2007).

[15]Torodol is a nonsteroidal anti-inflammatory drug that works by reducing chemicals that cause inflammation and pain in the body; it is used to treat moderate pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/ drug/d00273a1;_ylt=Ao7vptsErk7CWZS7Hv7PD0wkD7sF (last visited Aug. 9, 2007).

11

caused by hitting it on the door the previous day (Tr. at 225-228). She stated she worked as a waitress and needed a work excuse (Tr. at 225). Examination did not reveal any swelling; her mood and affect were normal (Tr. at 225, 227). Plaintiff stated she had run out of Vioxx three weeks ago (Tr. at 225). She was given an ace bandage, a fourteen-day supply of Vioxx 25 mg, and told to follow up in with an orthopedic doctor (Tr. at 226- 228).

Plaintiff went to the emergency room at Stormont Vail Hospital in Topeka, Kansas, on October 27, 2003, with complaints of a headache that had lasted four days (Tr. at 211-217). She rated her level of pain as a nine out of ten (Tr. at 213). Plaintiff was given Reglan[16] and Toradol while at the hospital, then discharged to rest at home (Tr. at 216).

On November 2, 2003, Plaintiff reported to The Kitchen Clinic with complaints of arthritis in her elbows, knees, hands and of migraines (Tr. at 219). She reported having trouble holding things, especially on the right hand due to numbness (Tr. at 219). Examination revealed tenderness to palpation over her elbows and knees, and mildly positive Phelan's[17] and Tinel signs[18] -- primarily on the right (Tr. at 219).

Starting January 8, 2004, Plaintiff began treatment at Burrell Behavioral Health with Marilyn Corson, RN (Tr. at 275-278). Her initial evaluation revealed that she previously used alcohol and cocaine to forget about her moods (Tr. at 276). Until the holidays, she had not used alcohol for eight

---

[16]Reglan is used to treat gastric reflux or heartburn. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00298a1;_ylt=AjvZhAiEz1c5dVB5bzQzXnUkD7sF (last visited Aug. 9, 2007).

[17]"Phalen's Maneuver is a diagnostic test for carpal tunnel syndrome." Wikipedia, Phalen's maneuver, at http://en.wikipedia.org/wiki/Phalen's_maneuver (last visited Aug. 9, 2007).

[18]Tinel's sign is "[a]n examination test that is used by doctors to detect an irritated nerve." MedicineNet.com, Definition of Tinel's sign, at http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited Aug. 9, 2007).

and a half months (Tr. at 276).  She last used cocaine one year ago and marijuana many years ago (Tr. at 276).  She also reported hearing her voice being called by a friend who she witnessed being killed during a drug incident (Tr. at 276).  A mental status exam revealed Plaintiff was alert and oriented with good grooming and eye contact (Tr. at 277).  Her psychomotor activity was somewhat fidgety (Tr. at 277).  Speech rate was normal, coherent, logical and goal-directed without flight of ideas or loose associations (Tr. at 277).  Her affect was euthymic (Tr. at 277).  Plaintiff evidenced adequate insight and judgment (Tr. at 277).  She denied delusions, but stated she felt people were watching her and knew bad things about her (Tr. at 277).  Within the last two years, she has heard a voice telling her to hurt the people who have hurt her and that the voice had increased over the last few months (Tr. at 277).  Current medications included Mobic, 7.5 mg daily (Tr. at 277).  Plaintiff was diagnosed with bipolar II disorder, panic disorder with agoraphobia,[19] and had  a GAF[20] of 50 (Tr. at 277).  She was started on Eskalith CR[21] 450 and Seroquel[22] 25 mg at night (Tr. at 278).

On January 27, 2004, Dr. Alan W. Aram, Psy.D., completed a Psychiatric Review Technique (Tr. at 261-271).  The form stated Plaintiff had (1) bipolar syndrome with a history of episodic

---

[19]Agoraphobia is "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks."  STEDMAN'S MEDICAL DICTIONARY 40 (28th ed. 2006).

[20]The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people 18 years of age and older.  It excludes physical and environmental impairments.  A GAF of 50 indicates serious symptoms, or a serious impairment in social, occupational, or school functioning.  Barbara L. Brown, Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V), at http://www.gpc.edu/~bbrown/psyc2621/ch3/gaf.htm (last visited Aug. 9, 2007).

[21]Eskalith "reduces chemicals in the body that cause excitation or mania" and is used to treat manic episodes of manic-depressive illness.  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00061a1;_ylt=AjyV98xXfLidcMJUIa_NJRkkD7sF (last visited Aug. 9, 2007).

[22]Seroquel is an antipsychotic medication.  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d04220a1;_ylt=At3Zr1pZ94pbLr9xGYMg.hkkD7sF (last visited Aug. 9, 2007).

13

periods manifested by the full symptomatic picture of both manic and depressive syndromes, and (2) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week (Tr. at 264, 266). Current medications included Eskalith and Seroquel (Tr. at 271). Dr. Aram noted Plaintiff had not consumed alcohol for eight months until the holidays when she had three beers, and had not used cocaine in one year (Tr. at 271). Plaintiff reported hearing voices increasingly over the past few months (Tr. at 271). She had previously witnessed her friend get her "face blown off" in a drug situation and still hears this friend call her name (Tr. at 271). Dr. Abram summarized and evaluated the evidence by stating that Plaintiff had a limited work history and long-standing drug and alcohol problems that were currently (largely) under control. She had two recent stressors -- watching her friend get shot and having her daughter receive psychological treatment out of state (Tr. at 271). Plaintiff was diagnosed with bipolar disorder and panic with agoraphobia (Tr. at 271). Dr. Aram opined that Plaintiff's impairments were severe but not expected to last twelve months, as he thought she would improve with continued medication and sobriety (Tr. at 261, 271).

Plaintiff followed up with Nurse Corson on February 9, 2004 (Tr. at 273-274). Current medications included Eskalith CR 450 mg twice a day and Seroquel 25 mg at night (Tr. at 273). She reported doing a little better with fewer outbursts (Tr. at 273). She had one panic attack in the store and could not finish shopping because she felt people were looking and coming at her, but, after leaving for a period of time, she was able to return and finish (Tr. at 273). She had been clean and sober (Tr. at 273). Nurse Corson noted Plaintiff's affect was bland, but she evidenced adequate insight and judgment (Tr. at 273). Although Plaintiff denied delusions and paranoia, she stated she hears strong voices telling her to harm her roommate when she is upset (Tr. at 273). Her GAF was

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 14 of 52

50 (Tr. at 274). Nurse Corson continued Plaintiff on the same dosage of Eskalith and increased her Seroquel to 25 mg as needed for loud voices or panic (Tr. at 274).

Charles Ash, M.D., conducted a consultative examination on February 12, 2004 (Tr. at 279-281). Physical examination revealed Plaintiff moved without a limp or list, and could walk on her toes and heels satisfactorily (Tr. at 279). She had a slight limitation of normal motion in her cervical, thoracic, and lumbar spine (Tr. at 279-280). Her upper extremities exhibited a normal range of motion (Tr. at 280). Pain in Plaintiff's right elbow was produced with right shoulder motion that was not anatomical (Tr. at 280). Pain was produced in the right wrist with motion (Tr. at 280). There was no weakness, deformity or atrophy; grip and pinch were strong in both hands (Tr. at 280). The decreased sensation in Plaintiff's right hand was subjective (Tr. at 280). Dr. Ash diagnosed Plaintiff with chronic neck and back strain and painful joints (Tr. at 280). However, he noted her findings were basically subjective and that he did not feel she had measurable limitation based on the objective findings (Tr. at 280).

On March 8, 2004, Plaintiff returned to Burrell Behavioral Health, at which time she reported always being nervous and only feeling comfortable in her room (Tr. at 293). A mental status exam revealed Plaintiff was alert, pleasant, interpersonally engaged, and demonstrated normal psychomotoric activity (Tr. at 294). Her speech was spontaneous, coherent, logical, and goal-directed (Tr. at 294). Plaintiff's mood was sad and depressed and her affect was constricted (Tr. at 294). She exhibited fair insight, good judgment, and oriented thought (Tr. at 294). She was continued on Eskalith and started on Lexapro[23] 10 mg daily (Tr. at 293).

---

[23]Lexapro "is used in the treatment of depression and generalized anxiety disorder." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04812a1;_ylt=AuU9QBMGhVqavmqSuMkSXdskD7sF (last visited Aug. 9, 2007).

Plaintiff's next appointment with Nurse Corson was on April 14, 2004 (Tr. at 431-432). She reported being depressed and said she had cried since last week; she also had not been sleeping (Tr. at 431). Plaintiff reported thinking that if she were not around she would not have to go through everything, but did not have a plan to harm herself (Tr. at 431). She was alert and oriented with good hygiene and eye contact (Tr. at 431). Her speech rate was normal, coherent, logical and goal-directed (Tr. at 431). Her affect was bland, but she evidenced adequate insight and judgment (Tr. at 431). She denied delusions but stated she heard voices three to four times a day that made her angry (Tr. at 431). She also felt quite paranoid when riding the bus, feeling that people were watching her, and spent a long time sitting in the bathroom to avoid them (Tr. at 431). Plaintiff also reported feeling more sad than happy (Tr. at 431). She reported having two panic attacks that she coped with by taking Seroquel, using deep breathing, reading her Bible, and playing music; this method was only partially effective (Tr. at 431). Nurse Corson diagnosed Plaintiff with bipolar disorder - most recent episode depressed, panic disorder with agoraphobia, and assessed her as having a GAF of 50 (Tr. at 432). Plaintiff was referred to a support group and instructed to continue taking Eskalith as prescribed (Tr. at 432). Her dosage of Seroquel was increased to 100 mg, one at night for a week then two at night and she was told to stop taking Lexapro (Tr. at 432). Plaintiff was also prescribed Lamictal[24] 25 mg, one at night for two weeks, two at night for two weeks, then five at night (Tr. at 432).

Nurse Corson also completed a Medical Source Statement-Mental (Tr. at 285-286). She opined that Plaintiff was markedly limited in the ability to work in coordination with or proximity

---

[24]Lamictal is "used in the treatment of bipolar disorder." Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d03809a1;_ylt=AklzSmN0QDGax__cTbPZktwkD7sF (last visited Aug. 9, 2007).

16

to others without being distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors (Tr. at 286). Plaintiff was moderately limited in the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Tr. at 285-286). Nurse Corson found Plaintiff was not significantly limited in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and make appropriate precautions (Tr. at 285-286).

Plaintiff continued treatment with Nurse Corson on May 19, 2004 (Tr. at 433-434). At that time, Plaintiff reported that her medications were helping her mood and anxiety but stated that she was frustrated about her housing situation (Tr. at 433). She also reported that when she became frustrated she would hear her name being called and would occasionally have the impulse to hurt others (Tr. at 433). She continued to report some anger, anxiety and psychotic symptoms that seemed to be influenced by psychosocial stressors (Tr. at 434). Plaintiff's affect was euthymic (Tr.

17

at 433). Plaintiff was diagnosed with bipolar II disorder, panic disorder with agoraphobia, and assessed as having a GAF of 50 (Tr. at 434). She was instructed to continue taking Eskalith, stop taking Lamictal, begin taking Trazodone[25] 150 mg, and begin taking Abilify[26] 10 mg; her Seroquel dosage was decreased (Tr. at 434).

Plaintiff presented at St. John's Regional Health Center's Emergency Room on June 4, 2004, with complaints of neck pain and chronic right arm pain (Tr. at 381-386). She was diagnosed with chronic cervical pain, prescribed pain medications, and referred to the Spinal Network (Tr. at 386).

On June 10, 2004, Plaintiff reported to the emergency room at Cox Heath due to neck pain that had been present for two days (Tr. at 473-476). She described the pain as burning, sharp and constant pain that radiated from her neck to her right arm (Tr. at 474). Range of motion to her neck caused increased pain (Tr. at 474). She reported she was not currently taking any medications, as she was waiting for an appointment with Dr. Fisher (Tr. at 474). Plaintiff was diagnosed with musculoskeletal neck pain and prescribed Vicodin, one to two tablets every four to six hours as needed for pain; Motrin 800 mg, one tablet three times per day; and Flexeril[27] 10 mg, one tablet three times per day as needed for pain for three days (Tr. at 473, 474, 476). She was also instructed to use alternating ice and heat and to follow up with her regular doctor (Tr. at 473).

On July 1, 2004, Plaintiff went to the emergency room at Cox Health at 3:52 p.m. for neck

---

[25]Trazodone is an antidepressant. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00395a1;_ylt= At1SdQo3UeH9.pmYhhoyZVokD7sF (last visited Aug. 9, 2007).

[26]Abilify is an antipsychotic medication. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d04825a1;_ylt=AiZA6K1nzHaNZt.VehqPzmQkD7sF (last visited Aug. 9, 2007).

[27]Flexeril is a muscle relaxant. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00963a1;_ylt= AiTYQUbFkGyTutfUfeD1mickD7sF (last visited Aug. 9, 2007).

18

and back pain that had lasted approximately two weeks (Tr. at 465-472). She described the pain as sharp and stated it was exacerbated by moving her neck (Tr. at 471). She was diagnosed with acute neck pain and prescribed Norflex,[28] one tablet twice daily for muscle spasms; and Anaprox,[29] one tablet two times daily for pain (Tr. at 465, 472). Plaintiff also went to the emergency room at St. John's Regional Health Center for a toothache at 6:46 p.m. that same day (Tr. at 374-380). She was prescribed Vicodin and Penicillin[30] and instructed to follow up with a dentist (Tr. at 375-376, 378).

On July 6, 2004, Plaintiff was first seen at the Family Medical Care Center (Tr. at 309-310). She was diagnosed with neck pain (Tr. at 310). Dr. Fisher prescribed Vicodin 5-500 mg and ordered a MRI (Tr. at 310).

Plaintiff went the emergency room at Cox Health on July 8, 2004, for tooth pain that started three days prior (Tr. at 457-465). She also complained of ear pain and dizziness and stated that over-the-counter medications were not working (Tr. at 458). Plaintiff was diagnosed with pain secondary to dental caries[31] (Tr. at 464). Plaintiff was prescribed Ibuprofen 400 mg, three times a day for two days; Penicillin for ten days; and Lortab as needed (Tr. at 457).

Plaintiff presented at the St. John's Regional Health Center Emergency Room on July 11, 2004, with complaints of dizziness, vertigo and nausea (Tr. at 359-373). She was diagnosed with

---

[28]Norflex is a muscle relaxant. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00966a1; _ylt=AmnonsCCqaLGHHhxHfXb8_skD7sF (last visited Aug. 9, 2007).

[29]Anaprox is a nonsteroidal anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d00019a1;_ylt=AiT3CNidVH439UMG47SKB3MkD7sF (last visited Aug. 9, 2007).

[30]Penicillin is an antibiotic. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00116a1;_ylt= AviKTx5gfjtnFKGxkjdrfV0kD7sF (last visited Aug. 9, 2007).

[31]A "localized, progressively destructive disease of the teeth." STEDMAN'S at 316.

19

dizziness, vertigo, and an urinary tract infection (Tr. at 265).

On July 12, 2004, Plaintiff reported for a MRI of the thoracic and cervical spine (Tr. at 455-456). The impression of her cervical spine showed minimal degenerative changes at the C5-6 level; there was no evidence of disk herniation or significant spinal canal stenosois (Tr. at 455). Findings from the impression of her thoracic spine were suspicions for a very mild thoracic rotoscoliosis[32] (Tr. at 456).

Plaintiff followed up at the Family Medical Care Center on July 13, 2004, after having been seen in the emergency room at St. John's over the weekend (Tr. at 306-308). She had bradycardia,[33] poor balance, ringing in her ears, continued dizziness, and described true vertigo (Tr. at 306). Plaintiff indicated the medications were not working and stated she was still vomiting three times a day (Tr. at 306). Dr. Halverson instructed her to start Ranitidine[34] for epigastic pain and ordered an echocardiogram (Tr. at 308). The echocardiogram was performed on July 14, 2004, and did not show any evidence of pericardial effusion, intracardiac mass, or valvular vegetation (Tr. at 453).

On August 4, 2004, Plaintiff went to the Cox Health System Emergency Room for upper left tooth pain (Tr. at 445-452). She was diagnosed with a fractured tooth, given a prescription for Penicillin and Ultram, and instructed to follow up with a dentist (Tr. at 445, 451-452).

Plaintiff presented at the St. John's Regional Health Center Emergency Room on August 5, 2004, with complaints of a toothache (Tr. at 346-351). She rated her pain as a nine on a ten-point

---

[32]Rotoscoliosis is the "[c]ombined lateral and rotational deviation of the vertebral column." STEDMAN'S at 1707.

[33]Bradycardia is defined as "[s]lowness of the heartbeat." STEDMAN'S at 249.

[34]Ranitidine "works by decreasing the amount of acid the stomach produces." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00021a1;_ylt=AnLDiReTGihYtyhBd4Hi1eMkD7sF (last visited Aug. 9, 2007).

scale and her jaw evidenced mild swelling (Tr. at 350).  Plaintiff advised Darvocet upset her stomach; when she was told to take it with food, she refused and stated she wanted something else (Tr. at 349). Plaintiff was prescribed pain medications and advised to follow up with a dentist (Tr. at 347).

Plaintiff was seen at the Family Medical Care Center on August 6, 2004 (Tr. at 300-301). She reported that her right arm would become weak and swell (Tr. at 300).  She also said she had been diagnosed with an inner ear infection in the emergency room and was out of Meclizine,[35] which seemed to help her dizziness (Tr. at 300).  Plaintiff was diagnosed with bipolar affective disorder - moderate, dizziness, and neck pain (Tr. at 300).  Nurse Dorothy Harsen advised Plaintiff she could refill her prescription for Meclizine, but Dr. Fisher needed to refill the Vicodin prescription; she also gave Plaintiff a prescription for Antivert[36] 25 mg every eight hours (#40) (Tr. at 301).

Plaintiff saw Nurse Corson on August 17, 2004 (Tr. at 429-430).  She reported leaving the house where she was living due to an abusive situation (Tr. at 429).  Her social worker at the Harmony House encouraged her to work at Ryan's Steakhouse, as she had done before (Tr. at 429).  Plaintiff stated she began working double shifts, started missing appointments, and was so confused that she was unable to keep up (Tr. at 429).  She ultimately quit her job and began living at the Victory House (Tr. at 429).  She reporting having been out of medication for five and a half weeks (Tr. at 429).  Nurse Corson noted Plaintiff was alert and oriented with good hygiene and eye contact (Tr. at 429).  Her speech rate was normal, coherent, logical and goal-directed (Tr. at 429).  Her affect

---

[35]Meclizine is an antihistamine.  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00859a1;_ylt =AhLsZN2B5hn3PNT.FJS1RQ4kD7sF (last visited Aug. 9, 2007).

[36]Antivert is the brand name for Meclizine, supra note 35.  Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d00859a1;_ylt=AiOPwIsksA1H_W5RbgdHYoEkD7sF (last visited Aug. 9, 2007).

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 21 of 52

was depressed, but she demonstrated adequate insight and judgment (Tr. at 429).  Plaintiff denied delusions, although she stated she felt people were talking about her and heard a voice telling her she was a failure (Tr. at 429).  She felt sad, isolated, and panicky (Tr. at 429).  Plaintiff's GAF was 55[37] and she was diagnosed with bipolar disorder, most recent episode depressed, and panic order with agoraphobia (Tr. at 430).  Nurse Corson instructed her to: (1) restart Eskalith, 450 mg, one at night for one week, one each morning and night for one week, one each morning, then two at night; (2) restart Seroquel 25 mg, three at night; and (3) restart Lexapro 10 mg, one half tablet each morning (Tr. at 430).

On August 31, 2004, Plaintiff presented at the Family Medical Care Center with complaints of a headache, dizziness, neck pain, general stiffness, and swollen hands (Tr. at 298-299).  She was diagnosed with neck pain and dizziness (Tr. at 298-299).  Dr. Fisher gave her prescriptions for Ranitidine HCL 150 mg twice daily and Ibuprofen 800 mg, one tablet every eight hours as needed (Tr. at 298-299).

On September 22, 2004, Plaintiff was seen at the Family Medical Care Center for an annual exam (Tr. at 296-297).  Current medications included: (1) Vicodin 5-500 mg, one to two tablets every four to six hours as needed for pain (last refill 07/06/04 #50); (2) Lithium Carbonate,[38] 150 mg twice daily; (3) Antivert, 25 mg every eight hours (last refill 08/06/04 #40); (4) Ranitidine HCL 150 mg twice a day (last refill 08/31/04 #60x12); (5) Ibuprofen 800 mg every eight hours as needed (last refill 08/31/04 #100 x3); (6) Lexapro 10 mg daily; and (7) Seroquel 25 mg, three tablets at night (Tr.

[37] A GAF score ranging from 51to 60 indicates moderate symptoms or "moderate difficulty in one of the following: social, occupational, or school functioning."  Brown, supra note 20.

[38] Lithium Carbonate is a generic form of Eskalith, supra note 21.  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00061a1;_ylt=ApWAVfM0avMeSoJXUTlc2lwkD7sF (last visited Aug. 9, 2007).

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 22 of 52

at 296).

On September 28, 2004, Plaintiff reported to Cox Emergency Room with a tender shoulder after falling (Tr. at 436-444). She was diagnosed with a right shoulder contusion/sprain (Tr. at 443). Plaintiff was given a sling for her shoulder and a prescription for Vicodin (Tr. at 438).

Plaintiff went to St. John's Regional Health Center's Emergency Room on October 15, 2004, with complaints of right shoulder pain (Tr. at 331, 335). She stated she had fallen from a standing position due to her leg becoming weak (Tr. at 333, 335). Plaintiff was diagnosed with a right shoulder contusion and prescribed Vicodin, one to two tablets every four to six hours as needed for pain, and Tylenol for less severe pain (Tr. at 332, 334). She was also given a sling to wear for up to one week and instructed to ice her shoulder for pain and swelling (Tr. at 334).

On October 12, 2004, Plaintiff had a follow-up visit with Nurse Corson (Tr. at 427-428). She reported that she did not have extensive depressive symptoms but was experiencing tearful spells (Tr. at 427). She denied panic attacks (Tr. at 427). Plaintiff complained of headaches and dizziness but said she did not want to see Dr. Fisher; instead, she was trying to find a new doctor who would verify that she had fibromyalgia[39] (Tr. at 427). Nurse Corson noted Plaintiff was alert and oriented with good hygiene and eye contact (Tr. at 427). Her speech rate was normal, coherent, logical, and goal-directed (Tr. at 427). Her affect was bland, but she evidenced adequate insight and judgment (Tr. at 427). She denied delusion, paranoia, or impaired reality (Tr. at 427). Nurse Corson diagnosed Plaintiff with bipolar disorder, most recent episode depressed, and panic disorder with agoraphobia (Tr. at 428). Plaintiff's GAF was 55 (Tr. at 428). Her dosage of Eskalith was decreased

---

[39]"A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbance." STEDMAN'S at 725.

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 23 of 52

to 450 mg, two at night; her dosage of Seroquel was increased to 100 mg, one at night; and her dosage of Lexapro was increased to 10 mg, one each morning (Tr. at 428). Nurse Corson recommended that she work part time for some income (Tr. at 427).

Plaintiff presented at St. John's Clinic on November 16, 2004, with neck and back pain, and multiple other complaints (Tr. at 329-330). She reported having neck pain since 1994 (Tr. at 329). The pain was severe at times and was located primarily in the paraspinal muscles over the right side along with the right trapezius (Tr. at 329). She also reported significant numbness in her right hand (Tr. at 329). Plaintiff said she had a prescription for Ibuprofen but it was contraindicated with her Lithium (Tr. at 329). Naproxen[40] and Vioxx were not helpful; Flexeril was helping and she tolerated Darvocet and Ultram (Tr. at 329). Plaintiff also complained of pain in both legs, primarily in her thighs and calves and with walking (Tr. at 329). She described the pain being so severe that she had to limp (Tr. at 329). Plaintiff also reported migraines and some vertigo that seemed to be improving (Tr. at 329). Current medications included Lithium Carbonate 450 mg twice daily, Antivert 25 mg three times daily, Zantac[41] 150 mg twice daily, Lexapro 10 mg daily, and Seroquel 75 mg at night (Tr. at 329). Physical examination of Plaintiff's neck revealed she had significant paraspinal tenderness on the right and also some trapezius tenderness (Tr. at 330). She also had some decreased range of motion on rotation (Tr. at 330). There was no significant tenderness noted in her lumbar spine (Tr. at 330). Dr. Harwell noted that Plaintiff's grip strength seemed normal although she

---

[40]Naproxen is a nonsteroidal anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00019a1;_ylt= Aim2VauG9uUnMis7egk65a4kD7sF (last visited Aug. 9, 2007).

[41]Zantac is the brand name for Ranitidine, supra note 34. Yahoo!Health, Drug Guide, at http://health.yahoo.com/ drug/d00021a1;_ylt=ApmN9e3HO0R.vCgIzC.9Az0kD7sF (last visited Aug. 9, 2007).

24

complained of decreased sensation of the first three digits in the right (Tr. at 330). Phalen's maneuver was positive (Tr. at 330). Plaintiff was diagnosed with chronic cervical pain that appeared muscular in origin and placed on Sulindac[42] 200 mg twice daily, as other medications were contraindicated with her Lithium (Tr. at 330). She was instructed to take Flexeril 10 mg, one-half to one three times daily as needed, and Tylenol #3 for severe pain only (Tr. at 330). Plaintiff was also instructed to (1) take one to two Fioricet[43] every four hours as needed for migraines, (2) take Aldactone[44] 50 mg daily as needed for edema, (3) continue taking Zantac for gastroesophageal reflux, and (4) continue taking Meclizine as needed for resolving vertigo (Tr. at 330).

On November 23, 2004, Plaintiff saw Nurse Corson for a follow-up visit (Tr. at 425-426). She reported having fallen twice in her apartment and was using a footed cane (Tr. at 425). Plaintiff was alert and oriented (Tr. at 425). Her speech was normal, coherent, logical, and goal-directed (Tr. at 425). Nurse Corson noted Plaintiff's affect was euthymic and she evidenced adequate insight and judgment (Tr. at 425). She denied delusions, but stated voices were trying to sneak in when she did not sleep well, and reported feeling paranoid at times (Tr. at 425). Current medications included: Eskalith CR 450 mg, two at night; Seroquel 100 mg, one at night; and Lexapro 10 mg, one each morning (Tr. at 425). Nurse Corson diagnosed Plaintiff with bipolar disorder in partial remission

[42]Sulindac is a nonsteroidal anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00033a1;_ylt=AnM3Gch6fcOgo2ibAVMv2NYkD7sF (last visited Aug. 9, 2007).

[43]Fioricet is a pain reliever and fever reducer. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03455a1;_ylt=AqWN5B1HoyF9c.gR8VlzmuwkD7sF (last visited Aug. 9, 2007).

[44]Aldactone is a diuretic. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00373a1;_ylt=AtGLCkrncWYmmxxUubF_c60kD7sF (last visited Aug. 9, 2007).

and panic disorder with agoraphobia (Tr. at 426). Plaintiff's GAF was 60[45] (Tr. at 426). She was instructed to continue taking Eskalith and Lexapro at the same levels, and her dosage of Seroquel was increased to 100 mg, one and a half tablets at night (Tr. at 426).

Plaintiff received physical therapy from January 11, 2005, until January 26, 2005 (Tr. at 403-421). She was seen for an initial evaluation on January 11, 2005, and complained of neck and low back pain (Tr. at 408). Plaintiff described her pain as "constant" and rated it as a nine on a ten-point scale (Tr. at 417). Cervical Spine Active Testing demonstrated active flexion, extension, retraction, side bending and rotation were all limited with pain provocation (Tr. at 412). The range of motion in Plaintiff's lumbar spine was also limited with pain provocation (Tr. at 412). A resisted upper/lower extremity test revealed right side weakness in all major myotomes of the upper extremities; dorsiflexion on the right side was 4/5, plantar flexion on the right was 4/5, and knee flexion and extension were 4/5 on the right (Tr. at 412). Additionally, her C7 and C8 dermatomes were altered on the right side (Tr. at 412). Plaintiff had a positive Spurling test[46] on the right side, a positive dural tension sign for her right arm, and a positive straight leg raise on the right side (Tr. at 413).

Plaintiff returned for one treatment (Tr. at 406). However, the therapist's office called after she did not show up for her next two appointments; Plaintiff hung up on them one time and did not answer the second time (Tr. at 405-407). On January 24, 2005, Plaintiff received physical therapy (Tr. at 404). She rated her pain as nine and a half on a ten-point scale and said it had not changed since her last visit (Tr. at 404). Plaintiff also received physical therapy on January 26, 2005 (Tr. at

_____

[45]A GAF score ranging from 51 to 60 indicates moderate symptoms or "moderate difficulty in one of the following: social, occupational, or school functioning." Brown, supra note 20.

[46]A Spurling test is used to detect cervical nerve root impairment. Drugs.com, Spurling test, at http://www.drugs.com/dict/spurling-test.html (last visited Aug. 14, 2007).

Case 6:06-cv-03305-REL    Document 15    Filed 09/04/07    Page 26 of 52

403). She felt she had not improved and rated her pain as nine and a half out of ten (Tr. at 403).

Plaintiff was discharged from physical therapy at her request on January 28, 2005 (Tr. at 401). She did not meet any of her goals (Tr. at 401). At the time Plaintiff asked to be discharged, she also requested to be transferred to the Pain Management Clinic (Tr. at 401).

On January 31, 2005, Plaintiff met with Nurse Corson (Tr. at 423-424). She was alert and oriented with good hygiene and eye contact (Tr. at 423). Her speech rate was normal, coherent, logical, and goal-directed (Tr. at 423). Her affect was bland, but she evidenced adequate insight and judgment (Tr. at 423). Although she denied delusions or paranoia, she reported hearing some voices (Tr. at 423). Current medications included: Seroquel, 100 mg, two at night; Eskalith CR, 450 mg, two at night; and Lexapro, 10 mg, one each morning (Tr. at 423). Plaintiff reported feeling happy overall (Tr. at 423). She denied episodes of panic and symptoms of depression, but did admit she could not handle a high-stress job and that she became offended by instructions from a nice boss (Tr. at 423). Nurse Corson diagnosed Plaintiff with bipolar disorder, in partial remission, and panic disorder with agoraphobia (Tr. at 424). Her GAF was 60 (Tr. at 424). Nurse Corson instructed Plaintiff to go to vocational rehabilitation to find employment (Tr. at 424). Plaintiff's dosage of Eskalith and Lexapro were continued at the same levels, her Seroquel dosage was increased to one 300 mg tablet at night (Tr. at 424).

On February 24, 2005, Plaintiff was taken by ambulance to the emergency room at St. John's Regional Health Center (Tr. at 312-327). She reported falling from a standing position and injuring her right hip; she had also fallen two days prior (Tr. at 315-317, 321). Plaintiff assessed her pain as a nine on a ten-point scale (Tr. at 319). Current medications included Lexapro, Lithium, Seroquel, and Flexeril; she stated she had been out of Vicodin for awhile (Tr. at 315). Plaintiff was given a

prescription for Lorcet Plus[47] and discharged (Tr. at 316).

On April 19, 2005, Plaintiff followed up with Dr. Harwell (Tr. at 509). She reported continued chronic neck and back pain (Tr. at 509). She reported initial injury in 1994 when a ceiling fan box fell on her lower neck/upper back (Tr. at 509). Since that time, she stated she has had chronic neck and back pain (Tr. at 509). She indicated the pain had worsened over the last few years and she had been unable to work since 2001 (Tr. at 509). Plaintiff stated she could neither sit nor stand more than ten minutes without significant pain (Tr. at 509). She was unable to walk very far and even doing dishes caused significant pain (Tr. at 509). Plaintiff appeared minimally uncomfortable during physical examination (Tr. at 509). Her cervical spine had a somewhat decreased range of motion, especially on flexion and extension (Tr. at 509). She had significant cervical tenderness and scattered tender points otherwise. Her lumbar spine had minimal tenderness (Tr. at 509). Straight leg raises were negative (Tr. at 509). Plaintiff was diagnosed with chronic neck and back pain along with fibromyalgia (Tr. at 509). Dr. Harwell opined Plaintiff was disabled and signed a loan discharge form indicating that Plaintiff should be discharged from her education loan due to her disabling conditions of chronic cervical lumbar pain, fibromyalgia, an inability to sit or stand more than ten minutes, and increased pain with lifting and standing (Tr. at 388, 509).

On May 9, 2005, Plaintiff went to the St. John's emergency room (Tr. at 684-694). She complained of right shoulder and wrist pain after tripping over a rug and falling on her right side (Tr. at 687, 689). X-rays of her right elbow and shoulder were normal (Tr. at 693-694). Plaintiff was diagnosed with a right shoulder contusion and strain (Tr. at 690). She was instructed to continue

---

[47]Lorcet Plus is used to relieve moderate to severe pain. Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d03428a1;_ylt=AtHLaMB2iTOlTIROaCZNDl0kD7sF (last visited Aug. 9, 2007).

using the sling as needed and prescribed fifteen Hydrocodone[48] for pain (Tr. at 685).

Plaintiff went to the emergency room at St. John's Regional Health Center on May 26, 2005 (Tr. at 677-682). She had tripped on a step and caught herself with her left hand/arm, and was suffering from elbow pain (Tr. at 677). Plaintiff's elbow was tender to examination, but she had a normal range of motion (Tr. at 677). X-rays of Plaintiff's left hand, wrist and elbow were normal (Tr. at 678, 680-682). Plaintiff was diagnosed with a left wrist and elbow strain and was dismissed (Tr. at 678). When leaving, Plaintiff requested the charge nurse call her because she did not appreciate the treatment she had received (Tr. at 683). Plaintiff was upset she was only given over-the-counter medication for her pain and threw the ice bag she was given on the bed (Tr. at 683).

On May 28, 2005, Plaintiff went to the emergency room at St. John's Regional Health Center (Tr. at 668-676). She stated she had fallen and hurt her left elbow, hand and wrist (Tr. at 673). Physical examination revealed tenderness in Plaintiff's upper extremities; her lower extremities were unremarkable (Tr. at 673). Nurses notes reveal that Plaintiff refused an ice bag and stated, "She's not gonna give me anything for pain" (Tr. at 674). When told she could take Tylenol, Plaintiff responded that she did not care for the treatment she received but did not explain further (Tr. at 674).

Plaintiff presented at the St. John's Regional Health Center Emergency Room on May 31, 2005, complaining of back and neck pain (Tr. at 656-667). She stated she had slipped on a rug and fell from a standing position (Tr. at 661). Doctor's notes indicate Plaintiff was trying to get back on disability (Tr. at 661). X-rays of Plaintiff's cervical and lumbar spine were unremarkable (Tr. at 666-667). She was diagnosed with a strain (Tr. at 662).

---

[48]Hydrocodone is a narcotic pain reliever. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d03361a1;_ylt=Aoig5QKlhQxNtmp7kIOxxbIkD7sF (last visited Aug. 9, 2007).

On June 2, 2005, Plaintiff reported to the St. John's Emergency Room with acute low back pain (Tr. at 644-655). She stated she had fallen three days ago and injured her neck and back (Tr. at 646). The physician observed Plaintiff walked with a cane without difficulty and noted she had a antalgic[49] gait (Tr. at 647). Plaintiff was instructed to obtain an appointment for a MRI and was prescribed Darvocet (Tr. at 645, 649).

On June 8, 2005, Dr. David Lutz, Ph.D., clinical psychologist, performed the consultative examination ordered by the ALJ (Tr. at 478-490). Dr. Lutz observed that Plaintiff's MMPI-2 validity scores indicated a profile that bordered on invalidity and stated her profile needed to be interpreted very cautiously as various factors suggested it was exaggerated (Tr. at 482). He further observed Plaintiff may very well have the characteristics indicated in her profile, just not to the exaggerated extent as contained in the profile (Tr. at 483). Dr. Lutz noted:

> Some of the statements in the reviewed reports were at odds with [Plaintiff's] descriptions here. The reviewed report indicated that [Plaintiff] has exhibited hypomanic behavior, but she did not report such behavior. It may be that because she is more depressed now, she does not remember such instances. The reviewed report indicated that [Plaintiff] had abused cocaine much more recently than she had admitted to. In fact, she initially denied having used cocaine. If she has used such a substance more frequently than indicated here, it could explain whatever hypomanic behavior she might have exhibited in the past. Finally, the reviewed report indicated that [Plaintiff] has panic disorder, suggesting that [Plaintiff's] anxiety symptoms typically appear without any obvious precipitants. Ms. Robinson suggested otherwise, indicating that her anxiety symptoms clearly are tied to specific incidents. It is difficult to reconcile these differences, making the following diagnoses and ratings somewhat tentative.

(Tr. at 483). Dr. Lutz then diagnosed Plaintiff with major depression, moderate to possibly severe, recurrent; pain disorder associated with psychological factors that exacerbate her physical difficulties and a GAF of 50 (Tr. at 483-484).

---

[49]A gait assumed to lessen pain.

Dr. Lutz also completed a medical source statement - mental (Tr. at 485-487). He opined Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. at 485-486). He further opined Plaintiff was not significantly limited in all other areas (Tr. at 485-487). Lastly, Dr. Lutz stated Plaintiff had the ability to perform the following work-related mental activities on a sustained basis: (1) understand, remember, and carry out simple instructions; (2) make judgments that are commensurate with the functions of unskilled work (i.e., simple work-related decisions); (3) respond appropriately to supervision, co-workers, and usual work situations; and (4) deal with changes in a routine work setting (Tr. at 487).

On June 13, 2005, Plaintiff presented at the Doctors Hospital of Springfield with complaints of fatigue, fibromyalgia and chronic pain in her neck, back and legs (Tr. at 500). Current medications included Lexapro, Eskalithium, Zantac, Sulindac, and Flexeril (Tr. at 500). Plaintiff reported she had been seeing Dr. Harwell for six months but that he did not believe in pain medication (Tr. at 500). She stated boxes had fallen on her and injured her neck and back (Tr. at 500). Plaintiff was diagnosed with insomnia, chronic pain fibromyalgia, sciatica,[50] sacroiliitis[51] and given a prescription for Prednisone[52] and Ultram, and instructed to follow up in one week (Tr. at

---

[50]Sciatica is "[p]ain in the lower back and hip radiating down the back of the thigh into the leg." STEDMAN'S at 1731.

[51]Sacroiliitis is the "[i]nflammation of the sacroiliac joint." STEDMAN'S at 1714.

[52]Prednisone is a steroid and "reduces swelling and decreases the body's ability to fight infections." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00350a1;_ylt=Ah33gNheqmxyHtDgMO6.HY8kD7sF (last

31

501).

Plaintiff saw Dr. Harwell at St. John's Clinic on June 15, 2005 (Tr. at 508). She stated she was still having a lot of pain (Tr. at 508). Plaintiff had also fallen and was having pain that radiated down her right leg (Tr. at 508). She was diagnosed with fibromyalgia and chronic neck and back pain (Tr. at 508). Dr. Harwell advised Plaintiff that her narcotics had to be limited and he would not prescribe stronger narcotics long term (Tr. at 508). Plaintiff was diagnosed with sciatica and given a prescription for thirty Lorcet Plus, with no refills (Tr. at 508). She was also instructed she could refill her Fioricet as needed for headaches (Tr. at 508). Because Dr. Harwell was leaving the area, he wrote Plaintiff refills on her medications for a few months (Tr. at 508).

On June 20, 2005, Plaintiff went to the urgent care center at the Doctors Hospital of Springfield (Tr. at 502-505). She walked with a cane and brought a driver with her (Tr. at 503). Plaintiff reported falling onto concrete three weeks ago and having been told at St. John's Health Center that she did not have a fracture (Tr. at 502). She has had low back pain that radiated into her right leg since that time (Tr. at 502). The nursing assessment sheet stated she had fibromyalgia pressure on her spinal cord that caused pain down her right leg (Tr. at 504). Prednisone did not decrease the pain; additionally, Plaintiff stated she was unable to take Darvocet because it upset her stomach or Ibuprofen due to its interaction with Lithium (Tr. at 503, 504). Current medications included Eskalith, 250 mg at night; Lexapro, 10 mg once a day; Sulindac, 150 mg twice daily; Ranitidine, 300 mg twice daily; and Tramadol[53] as needed (Tr. at 504). Plaintiff was diagnosed with

---

visited Aug. 9, 2007).

[53]Tramadol is the generic form of Ultram, supra note 6. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03826a1;_ylt=Akuljj4DdHxDRFweYrMAo.8kD7sF (last visited Aug. 9, 2007).

back pain (Tr. at 503). The examining physician stated he could not prescribe Plaintiff anything different for her pain, as a primary care physician needed to manage her medications (Tr. at 505).

On June 21, 2005, Plaintiff was seen at the Doctors Hospital of Springfield for complaints of pain in her legs, feet, wrists, hands and shoulders (Tr. at 498). She rated her pain as a nine on a ten-point scale and used a cane to walk (Tr. at 498). Plaintiff reported receiving a shot for pain in the urgent care center that did not help (Tr. at 498). She also stated Tylenol 3 and Tramadol had not been effective (Tr. at 498). Physical examination revealed right static nerve tenderness (Tr. at 499). Plaintiff was diagnosed with sciatica, sacroiliitis, back pain, and fibromyalgia (Tr. at 499).

On July 5, 2005, Plaintiff was seen by Dr. DelaRosa at St. John's Clinic to establish care (Tr. at 507). She initially asked for pain medications but Dr. DelaRosa told her that because her pain was from fibromyalgia and sciatica, he wanted to wait until she was evaluated at the Spine Center (Tr. at 507). Current medications included Lithium, 450 mg twice daily; Lexapro, 10 mg daily; Seroquel, 75 mg every night; Zantac, 300 mg twice daily; Antivert, 25 mg three times daily; Flexeril, 10 mg three times daily; and Lorcet Plus (Tr. at 507). She stated she was on disability; Dr. DelaRosa noted he was not sure why except possibly due to her psychiatric illness (Tr. at 507). Plaintiff was diagnosed with gastroesophageal reflux disease symptoms, fibromyalgia, leg swelling, headache, and chronic neck and back pain (Tr. at 507). Dr. DelaRosa opined Plaintiff's psychiatric component might also be affecting her perception of pain (Tr. at 507).

Plaintiff followed up at Burrell Behavioral Health on July 6, 2005 (Tr. at 515-516). She reported having continued problems with her back and stated she was currently receiving steroid injections (Tr. at 515). Plaintiff stated she had been coping with her circumstances (Tr. at 515). Her affect was euthymic (Tr. at 515). She denied delusions but stated she believed people were talking

33

about her and said she had been hearing voices (Tr. at 515). Nurse Corson noted Plaintiff had continued to hear voices even after her antipsychotic medication was resumed (Tr. at 515). Plaintiff was diagnosed with bipolar II disorder, with her most recent depressed episode in remission, and panic disorder with agoraphobia (Tr. at 516). Plaintiff's GAF was 60 (Tr. at 516). She was instructed to continue Eskalith CR, 450 mg two at night; Lexapro, 10 mg daily; and Diazepam,[54] 10 mg one up to four times a week as needed for panic attacks (Tr. at 516). She was also instructed to stop taking Doxepin[55] and restart Seroquel, 100 mg, three at night (Tr. at 516).

On July 10, 2005, Plaintiff reported to the St. John's Regional Health Center Emergency Room with complaints of sharp left leg pain (Tr. at 632-641). She stated she had chronic pain and was out of medication (Tr at 635, 639). Physical examination revealed a full range of motion (Tr. at 640). She was diagnosed with chronic pain and given a prescription for Lortab (Tr. at 633, 640).

Plaintiff cancelled her July 14, 2005, appointment at St. John's (Tr. at 642-643).

On July 23, 2005, Plaintiff went to the emergency room at St. John's Regional Health Center (Tr. at 622-631). She reported stepping off the curb that morning (Tr. at 625). Physical examination did not reveal any apparent swelling and she had a full range of motion (Tr. at 625). Plaintiff elected not to have x-rays (Tr. at 630). She was diagnosed with a right knee and ankle sprain and instructed to elevate, apply ice, and use crutches for support (Tr. at 623). An air splint was applied to her right ankle and she was prescribed Vicodin for pain (Tr. at 623, 628).

---

[54]Diazepam "is used to relieve anxiety, nervousness, and tension associated with anxiety disorders[;] [i]t is also used to treat certain types of seizure disorders and muscle spasms." Yahoo!Health, Drug Guide, at http://health. yahoo.com/drug/d00148a1;_ylt=AqJBB7h_RH33yFl_EP84kY4kD7sF (last visited Aug. 9, 2007).

[55]Doxepin is an antidepressant. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00217a1;_ylt= AinStpe.PHD08Ucb0JBVP70kD7sF (last visited Aug. 9, 2007).

On September 9, 2005, Plaintiff sought treatment at St. John's Emergency Room for a right knee injury (Tr. at 607-616, 610-620). Plaintiff reported sustaining the injury by falling off a curb and twisting her knee (Tr. at 610, 614). She described the pain as constant and throbbing and rated it as an eight on a ten-point scale (Tr. at 610). Physical examination revealed Plaintiff had a limited range of motion in her right knee; her gait was not tested due to pain (Tr. at 614). X-rays of her right knee and ankle were normal (Tr. at 615, 617-620). Plaintiff was diagnosed with a sprained right knee and ankle (Tr. at 608, 613). An aircast was placed on Plaintiff's ankle and she was instructed to rest, apply ice and compression, elevate her right knee and ankle, and to progressively bear weight with crutches (Tr. at 613). Plaintiff was given a prescription for Vicodin and sent home (Tr. at 611, 613). During a September 18, 2005, follow-up telephone call, Plaintiff reported she was not doing any better (Tr. at 621).

On September 18, 2005, Plaintiff presented at St. John's Emergency Room complaining of right hip pain after falling (Tr. at 595-604). She stated she was taking out the trash, experienced a sharp pain, and her leg gave way (Tr. at 602). Physical examination revealed she was in moderate distress (Tr. at 602). Plaintiff had a muscle spasm and limited range of motion in her back; her right leg was painful (Tr. at 603). A MRI of her right hip and pelvis were unremarkable (Tr. at 605). Plaintiff was diagnosed with a hip and thigh contusion and given fifteen Lorcet Plus (Tr. at 596, 601, 603).

Plaintiff went the St. John's Emergency Room on September 30, 2005, for back pain; she walked with difficulty (Tr. at 583-594). Plaintiff stated she injured her back lifting heavy trays and/or a dish basket at work (Tr. at 588, 592). Physical examination revealed Plaintiff was in moderate to mild distress (Tr. at 588, 593). She experienced back pain with flexion (Tr. at 588).

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 35 of 52

Plaintiff was diagnosed with an acute myofascial strain of her lumbar spine and flank and prescribed twenty Hydrocodone 7.5 (Tr. at 584, 593).

On September 30, 2005, Plaintiff also saw Nurse Corson (Tr. at 513-514). She reported feeling anxious and "spastic" following her brother's murder (Tr. at 513). Her affect was bland and she reported hearing a voice that told her to hurt her brother's murderer (Tr. at 513). She felt more sad than happy (Tr. at 513). Plaintiff stated her medications made her feel heavy and cloudy during the day (Tr. at 513). She reported coping with anxiety by going to church, reading her Bible, and listening to music (Tr. at 513). Plaintiff was diagnosed with bipolar II disorder, most recent episode depressed in partial remission, panic disorder with agoraphobia, and had a GAF of 60 (Tr. at 514). Her Diazepam dosage was decreased to 5 mg, one half up to three times a day, and her Seroquel was increased to 200 mg two at night (Tr. at 514). She was continued on Eskalith CR, 450 mg two at night; and Lexapro, 10 mg one daily (Tr. at 514).

On October 4, 2005, Plaintiff was taken to St. John's Emergency Room by ambulance with complaints of low back and hip pain on the left side (Tr. at 562-580). Her injury was caused by moving furniture; she said she did not bend her knees when doing so because they hurt (Tr. at 571). Plaintiff rated her pain as nine and a half on a ten-point scale and stated this also happened three months ago (Tr. at 566). Physical examination revealed Plaintiff to be in mild distress; she had muscle spasms in her lumbar spine (Tr. at 571, 576). Her legs were weak due to fibromyalgia and she experienced back pain with range of movement (Tr. at 571). Her gait was unsteady and shuffling and the doctor noted she was unable to walk (Tr. at 571). A MRI of Plaintiff's lumbar spine was unremarkable (Tr. at 581). She was diagnosed with an acute myofascial strain of her lumbar region and given prescriptions for Flexeril and Vicodin (Tr. at 568, 576).

36

Plaintiff sought care in the St. John's Emergency Room on October 15, 2005, for a muscle strain in her back and ribs (Tr. at 551-561). She stated she injured herself lifting a couch; she also had a history of back pain that had worsened since the murder of her brother and death of her grandfather (Tr. at 554, 558). Plaintiff was given twenty Darvocet N for severe pain but advised further pain medication would have to be obtained from her primary care physician (Tr. at 557, 560).

On October 17, 2005, Plaintiff was taken by ambulance to the emergency room at St. John's Regional Health Center (Tr. at 547-550). She complained of back pain and shortness of breath (Tr. at 550). Although Plaintiff reported a history of back pain since an accident in 1994, the instant pain resulted from lifting a stack of books (Tr. at 550).

On October 21, 2005, Plaintiff presented to the emergency room at St. John's Regional Health Center with complaints of back pain (Tr. at 531-541). She stated she was moving and strained her back by picking up a television (Tr. at 534). She was diagnosed with chronic back pain and given a prescription for thirty Norflex, 100 mg twice a day as needed and eight Percocet, 7.5/500 one every four hours as needed (Tr. at 539-540).

Plaintiff was transported by ambulance to St. John's Emergency Room on October 26, 2005, for non-traumatic back pain (Tr. at 518-530). The pain began after leaning over cleaning a bathtub (Tr. at 529). She rated the pain as a nine and a half out of ten, and described the pain as sharp burning pain that started in her lower back and radiated to her back or right leg (Tr. at 529). She used a cane and walked at a steady gait (Tr. at 522). Physical examination revealed she was in mild to moderate distress (Tr. at 526). Her neck was non-tender and she had painless range of motion (Tr. at 526). She had a decreased range of motion in her back (Tr. at 526). Straight leg raises were

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 37 of 52

negative (Tr. at 526). She was given Demerol and Phenergan[56] in the emergency room (Tr. at 522). Plaintiff was ultimately diagnosed with chronic back pain and given eighteen Ultracet[57] and twenty-one Flexeril (Tr. at 526, 530).

Plaintiff sought treatment at Burrell Behavioral Health on November 30, 2005 (Tr. at 511-512). She stated she had experienced several panic attacks when she attended the trial of her brother's murderer (Tr. at 511). Plaintiff had good hygiene and eye contact (Tr. at 511). Her affect was bland but brightened (Tr. at 511). She denied delusions or impaired reality but stated there were times she felt people in her apartment complex looked at her as if she did not need to use a cane (Tr. at 511). Nurse Corson instructed Plaintiff to continue taking Diazepam, 5 mg up to three times a day; Eskalith CR, 450 mg two at night; Seroquel, 200 mg two at night; and to increase her Lexapro dosage to 20 mg every morning (Tr. at 512).

On December 16, 2005, Plaintiff was seen in the Doctors Hospital of Springfield's Emergency Room for musculoskeletal pain (Tr. at 492-497). Physical examination revealed the range of motion in her left shoulder was limited (Tr. at 493). X-rays of Plaintiff's left shoulder, left elbow and left ribs were unremarkable (Tr. at 495). Plaintiff was given a prescription for Flexeril and discharged (Tr. at 493).

## C. SUMMARY OF TESTIMONY

The initial hearing was on May 17, 2005 (Tr. at 48-59). Because the record only contained a nurse's documentation of Plaintiff's psychological condition, the ALJ ordered Plaintiff to undergo

---

[56]Phenergan is an antihistamine. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00787a1;_ylt= AgPy9l6v_oQTgZuDob6l_PIkD7sF (last visited Aug. 9, 2007).

[57]Ultracet is a pain reliever. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04766a1;_ylt= AnL7jjh34xKBDw7x4cuey10kD7sF (last visited Aug. 9, 2007).

Case 6:06-cv-03305-REL    Document 15    Filed 09/04/07    Page 38 of 52

a consultative exam by a psychologist. After receipt of this new evidence, a supplemental hearing was held on January 12, 2006 (Tr. at 60-80).

### *Initial Hearing*

Plaintiff testified during the May 17, 2005, hearing. Vocational expert Terri Crawford also testified at the request of the ALJ.

**1.      Plaintiff's Testimony**

Plaintiff testified she was forty years old, 5' 7" tall, and weighed 209 pounds (Tr. at 54). She reported gaining forty-five pounds within fifteen months due to her medications (Tr. at 54-55). Plaintiff stated she had a college degree in retail management and business administration (Tr. at 55). She also completed cosmetology school (Tr. at 55).

Plaintiff last worked for approximately a year and a half at Ryan's Steak House as a waitress/server (Tr. at 56). She worked double time until October of 2003. Plaintiff did not believe she could currently perform that job as it would require her to be on her feet and to carry heavy trays (Tr. at 56-57). Previous work included, inter alia, managing cashiers at the Pepper Tree Restaurant and management of the front desk clerk (Tr. at 58). She described her positions as a waitress and a sales clerk as "extreme hard work" (Tr. at 59).

**2.      Testimony of Vocational Expert Terri Crawford**

Ms. Crawford summarized Plaintiff's past relevant work as follows: (1) waitress, light work, semi-skilled labor performed at the medium exertional level; (2) sales clerk, light work, semi-skilled labor performed at the medium exertional level; and (3) telephone solicitor, sedentary work, semi-skilled labor performed at the medium exertional level (Tr. at 57-58).

*Supplemental Hearing*

Plaintiff testified during the January 12, 2006, hearing; vocational expert Michael Lala also testified at the request of the ALJ.

**1.      Plaintiff's Testimony**

Plaintiff testified she has not had a source of income since October of 2003 (Tr. at 64).  She receives food stamps and lives in public housing (Tr. at 64).  Plaintiff reported being unable to drive a car (Tr. at 64).  A friend helps her with laundry (Tr. at 64).  Plaintiff sometimes makes her own meals (Tr. at 64).  She reported alternating between preparing the meal and sitting down due to difficulty standing; the same was true with washing dishes (Tr. at 64-65).  Plaintiff cannot sit or stand for more than ten minutes without needing a break (Tr. at 64, 68).  She stated she does not dust, clean the bathroom, sweep, mop, vacuum, or shop for groceries and clothing (Tr. at 65).

Plaintiff testified she tries to read her Bible a little bit throughout the day (Tr. at 65).  She does not go for walks or exercise (Tr. at 65).  Plaintiff estimated she could walk for ten minutes (Tr. at 65).  She does not provide care for others (Tr. at 66).  Occasionally, Plaintiff has trouble using her hands or fingers for buttoning buttons, picking up coins, and writing due to numbness and sharp pains (Tr. at 66).  She attends church twice a month (Tr. at 67).

Plaintiff stated she used to be very active (Tr. at 67).  She reported walking a lot and using a treadmill (Tr. at 67).  On the date of the supplemental hearing, Plaintiff walked with a cane that had been prescribed by Dr. Harwell (Tr. at 67).  She reported soaking in a hot tub as often as she could (Tr. at 68).  With regard to her limitations, Plaintiff testified she tries to limit herself to lifting ten pounds (Tr. at 68).  She lies down five to six times a day for one half of an hour to one hour, depending on the day (Tr. at 68-69).  Coldness and wind cause Plaintiff to feel worse (Tr. at 69).

40

When asked by her attorney, Plaintiff described the pain in her upper back and neck as "constant, dull, aching, sharp pain" (Tr. at 69). She stated the pain was a nine on a ten-point scale, although medication helped reduce it to approximately an eight (Tr. at 69). The neck pain also caused serious headaches about four times a week that lasted an average of five hours (Tr. at 72). When Plaintiff has these headaches, she takes medication every six hours and usually starts to feel relief with the second dose (Tr. at 73). Plaintiff has vertigo that causes dizziness lasting four or five days twice a month (Tr. at 73). She has also been diagnosed with fibromyalgia with pain at the top part of her neck down through her shoulders and shoulder blades, elbows, lower back, knees, feet, and thighs (Tr. at 73). She experiences fatigue and tiredness and uses a cane to walk (Tr. at 73-74). Plaintiff stated she had experienced falling spells due to the pain in her legs (Tr. at 74).

Concerning her hands, Plaintiff stated her joints locked up and swelled (Tr. at 70). Her hands were achy with sharp numbness approximately fifty percent of the time, especially her right hand (Tr. at 70). Plaintiff also had constant pain in her right arm that originated in her neck (Tr. at 70). She had difficulty using her hands and arms for handling objects and needed to rest after five or ten minutes (Tr. at 70).

Plaintiff had been treated for bipolar condition for several years (Tr. at 70). During the depression stages, she did not want to come out of her apartment or see anyone (Tr. at 71). She had elevated crying spells and trouble with concentration and focus (Tr. at 71). On one occasion, Plaintiff did not last even one day at a job because it was too fast paced (Tr. at 71). She also had difficulty performing jobs because of the standing and/or lifting requirements (Tr. at 71).

Plaintiff experiences anxiety and panic attacks (Tr. at 71-72). She had just been prescribed a new medication as she had been experiencing more frequent attacks (Tr. at 72). She testified she

41

had panic attacks about three times a week and that she did not feel the new medication was working (Tr. at 72). Plaintiff has also heard voices in the past and continues to have problems with paranoia and nervousness (Tr. a 72).

Lastly, Plaintiff testified her medications caused drowsiness, dizziness, and sleepiness (Tr. at 74). She is slower than she used to be and estimated she currently operated at ten percent (Tr. at 74).

## 2.     Testimony of Michael Lala

Mr. Lala did not agree with Ms. Crawford's categorization of Plaintiff's relevant work as that of a waitress, sales clerk, and telephone solicitor (Tr. at 75). Instead, he opined Plaintiff did not have any past relevant work due to low earnings and an inability to achieve substantial gainful activity for any of her past jobs (Tr. at 75).

Mr. Lala was first asked to assume a hypothetical person of Plaintiff's age, education, and vocational experience who would generally be limited as she testified (Tr. at 75-76). The ALJ asked if such person could lift nine to ten pounds, sit or stand for ten minutes, walk for ten minutes, be required between 8:00 in the morning and 5:00 in the afternoon to lie, rest, or recline five to six times a day for thirty to sixty minutes each, who would have the psychological limitations as set forth by Exhibit 9F,[58] should avoid extreme cold, required a four-pronged cane for walking, and had

---

[58]Nurse Corson opined that Plaintiff was markedly limited in the ability to work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors (Tr. at 286). Plaintiff was moderately limited in the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Tr. at 285-

limited overhead reaching, whether he or she could perform work (Tr. at 76). Mr. Lala opined such an individual could not (Tr. at 76).

Next, the ALJ asked Mr. Lala to assume a hypothetical person of Plaintiff's age, education, and vocational experience who could frequently lift ten pounds and occasionally lift twenty pounds, sit for sixty to ninety minutes before needing to change positions, stand for approximately sixty minutes, walk for approximately sixty minutes, both sit and stand for six hours in an eight-hour day, who had the psychological limitations set forth in Exhibit 19F pages 8-10,[59] had limited overhead reaching ability, and needed to avoid extreme cold (Tr. at 76). Mr. Lala opined such an individual would be able to perform a full range of sedentary and partial range of light, unskilled work (Tr. at 76). An example of a light, unskilled job was a storage facility rental clerk; this job exists in the four-state region of Missouri, Ohio, Nebraska and Kansas at the rate of 5,300, and in the national economy at a rate of 240,000 (Tr. at 76). An example of a sedentary job was that of a hand mounter (Tr. at 77). This job exists in the previously-described four-state region at a rate of 2,500, and in the national economy at a rate of 149,000 (Tr. at 77).

Plaintiff's attorney then questioned Mr. Lala (Tr. at 77-79). He asked Mr. Lala to assume the limitations in the ALJ's second hypothetical question and to further assume the limitations as

---

286). Nurse Corson found Plaintiff was not significantly limited in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and make appropriate precautions (Tr. at 285-286).

[59]Dr. Lutz opined Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. at 485-486). He further opined Plaintiff was not significantly limited in all other areas (Tr. at 485-487). Lastly, Dr. Lutz stated Plaintiff had the ability to perform the following work-related mental activities on a sustained basis: (1) understand, remember, and carry out simple instructions; (2) make judgments that were commensurate with the functions of unskilled work (i.e., simple work-related decisions); (3) respond appropriately to supervision, co-workers, and usual work situations; and (4) deal with changes in a routine work setting (Tr. at 487).

contained in Exhibit 14F page 2, which precluded sitting or standing for more than ten minutes at a time, that Dr. Harwell opined Plaintiff had (Tr. at 77). Mr. Lala testified such limitations would preclude all work (Tr. at 77). He also testified that the mental limitations contained in Exhibit 9F alone would preclude all work (Tr. at 78). Finally, when asked if an individual who could not accept instructions and respond appropriately to criticism from supervisors one-third of the time or get along with co-workers and peers without distracting them or exhibiting behavioral extremes one-third of the time could work as storage facility rental clerk or a hand mounter, Mr. Lala opined that he or she could (Tr. at 79).

### D.  FINDINGS OF THE ALJ

On April 27, 2006, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (Tr. at 26). At step two, the ALJ found Plaintiff's chronic cervical and lumbar strain, depression, and fibromyalgia syndrome were "severe" impairments (Tr. at 26). However, he found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing (Tr. at 26). At step four, the ALJ found Plaintiff did not have any past relevant work (Tr. at 27). Finally, the ALJ found Plaintiff could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy (Tr. at 27).

### V. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff contends that the ALJ's residual functional capacity ("RFC") determination was not supported by substantial evidence, arguing he failed to link the RFC to any evidence of record. An ALJ determines a claimant's RFC by evaluating all relevant evidence, including "medical records,

44

observations of treating physicians and others, and claimant's own descriptions of his limitations."
Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." Id. at 1218. In evaluating credibility, an ALJ must consider all relevant factors, including the claimant's prior work record and observations by third parties and treating and examining physicians relating to such matters as Plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

In this case, substantial evidence supports the ALJ's credibility determination. First, "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall, 274 F.3d at 1218. The record reflects that Plaintiff has a sporadic work history often holding jobs for very short periods of time and, consequently, has a very limited earnings record (Tr. at 107, 112, 119, 133, 140). Next, Plaintiff's daily activities do not suggest she is as limited by her impairments as she maintains. Plaintiff reported in her Background Questionnaire that she was unable to make her bed and/or change the sheets because bending over grasping the sheets was painful and she was too weak to pull the sheets and bedspread (Tr. at 174). She also reported an inability to take out the trash because lifting the bag was painful; she could not mow the lawn as she lacked the strength to push or pull (Tr. at 174). She testified at the January 12, 2006, hearing that she did not dust, clean the bathroom, sweep, mop, vacuum, or shop for groceries and clothing, and tried to limit herself to lifting ten pounds (Tr. at 65, 68). However, the record reflects Plaintiff adjusted a satellite system on a roof, took out the trash, lifted heavy trays and/or a dish basket, moved furniture, lifted a couch, leaned over to clean a bathtub, and lifted books -- often just days apart (Tr. at 229, 529, 550, 554,

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 45 of 52

558, 571, 588, 592, 602). These factors both support the ALJ's credibility determination.

Third, "[a] failure to follow a recommended course of treatment also weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 789, 802 (8th Cir. 2005)(citing Gowell v. Apfel, 242 F.3d 793, 797 (8th Cir. 2001)); see also Brown v. Chater, 87 F.3d 963.965 (8th Cir. 1996)(holding a claimant's failure to comply with prescribed medical treatment and a lack of significant medical restrictions is inconsistent with complaints of disabling pain). In this case, Plaintiff did not follow recommended courses of treatment both with regard to scheduling/attending appointments and adhering to a medication regimen. Plaintiff was instructed repeatedly in her numerous emergency room visits to follow up with other health care providers (i.e., primary care physician, orthopaedic doctor, dentist). The medical evidence of record does not show Plaintiff ever did so. Plaintiff was likewise noncompliant with orders to participate in physical therapy. Dr. McMillin placed Plaintiff in physical therapy on November 26, 2002 (Tr. at 197), but the records do not indicate she ever went. Plaintiff was again ordered to undergo physical therapy in January of 2005 (Tr. at 403-421). After her initial appointment on January 11, 2005, Plaintiff missed the next two -- hanging up when the therapist's office called the first time and not answering the second (Tr. at 405-407). Plaintiff attended her January 26, 2007, appointment and subsequently asked to be discharged; she did not meet any of her goals (Tr. at 401). Additionally, the medical evidence of record shows that Plaintiff did not have prescriptions filled and stopped taking prescribed medications without a doctor's order to do so, at one time going five and a half weeks without medications (Tr. at 249, 254, 429, 474).

Fourth, the timing and frequency of Plaintiff's emergency room visits, coupled with her specific requests for narcotic pain relievers, weigh against her credibility. Plaintiff obtained Vicodin

and Vioxx on November 9, 2002, but on November 11, 2002, she reported to the emergency room requesting a new prescription because she had dropped the medications she received two days earlier down the sink (Tr. at 245). The records also demonstrate Plaintiff would report to the emergency room, often at different hospitals, requesting pain medication within days of each other or even on the same day. Furthermore, Plaintiff became upset when she was given only over-the-counter pain medication at St. John's Regional Health Center on May 26, 2005, stating she did not appreciate the treatment she had received (Tr. at 683). On May 28, 2005, Plaintiff again refused other treatment after she was not prescribed pain medication (Tr. at 674). On July 23, 2005, Plaintiff elected not to have X-rays (Tr. at 630). Dr. Harwell told Plaintiff her narcotics had to be limited and he would not prescribe stronger narcotics long term (Tr. at 508). On June 20, 2005, the examining physician at the Doctors Hospital of Springfield advised Plaintiff he could not prescribe her anything different for pain, as a primary care physician needed to manage her medications (Tr. at 505). When she ask Dr. DelaRosa for pain medications, he declined to prescribe them (Tr. at 507).

Fifth, and finally, the record contains several miscellaneous instances that support the ALJ's credibility determination. Plaintiff's MMPI-2 validity scores suggested Plaintiff was exaggerating (Tr. at 482). Plaintiff made inconsistent statements about when she stopped working. She stated in her Disability Report that she had not worked since October 15, 2003 (Tr. at 146). She then told Dr. Harwell on April 19, 2005, that she had been unable to work since 2001 (Tr. at 509). However, on September 30, 2005, Plaintiff reported she had injured her back lifting heavy trays and/or a dish basket at work (Tr. at 588, 592). Plaintiff made inconsistent statements regarding previous drug use. She told Nurse Corson on January 8, 2004, that she last used cocaine one year ago (Tr. at 276). She similarly told Dr. Aram on January 27, 2004, that she had not used cocaine in one year (Tr. at 271).

When interviewed by Dr. Lutz, however, she initially denied cocaine use (Tr. at 483). Plaintiff also made inconsistent statements concerning her educational background. On October 21, 2002, while at Cox Medical Center, Plaintiff reported she had a college degree in business administration and computers, and an associate's degree in psychology (Tr. at 254). At the May 17, 2005, hearing Plaintiff testified she had a college degree in retail management and business administration, and that she had also completed cosmetology school (Tr. at 55). The totality of the above-discussed factors thus support the ALJ's decision to discredit Plaintiff's subjective descriptions of her limitations.

_____Having concluded the ALJ correctly evaluated Plaintiff's credibility, I now turn to the ALJ's RFC determinations. Because the ALJ made separate findings for Defendant's physical and mental impairments, each will be discussed separately.

### A. RFC - Physical

The ALJ found Plaintiff retained the capacity to lift and carry twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, sit sixty to ninety minutes without changing positions, stand and/or walk six hours in an eight-hour day, stand and/or walk sixty minutes without rest, had limited ability to reach overhead, and must avoid extreme cold (Tr. at 26). Plaintiff maintains this determination erroneous, especially in light of her treating physician Dr. Harwell's opinion that she was disabled and Dr. DelaRosa's opinion that she suffered from a psychiatric component that affected her perception of pain. I disagree.

Although opinions of a treating physician are often entitled to substantial weight when they are well-supported and consistent with other evidence, an ALJ need not give controlling weight to a treating physician's opinion that is not supported by medically acceptable laboratory and diagnostic techniques or is inconsistent with the other substantial evidence of record. See Hacker v. Barnhart,

48

459 F.3d 934, 937 (8th Cir. 2006). Moreover, when a treating physician's notes are inconsistent with his own subsequent opinions, the court need not give controlling weight to such opinions. See Pirtle v. Astrue, No. 06-2363, 2007 WL 763818, at * 2 (8th Cir. Mar. 15, 2007)(citing Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)).

Substantial evidence in this case supports the ALJ's RFC finding. That is, the ALJ properly gave less weight to Dr. Harwell's opinion that Plaintiff was disabled since his opinion did not comport with his own objective findings and because he relied on Plaintiff's subjective descriptions of her limitations. When Dr. Harwell saw Plaintiff on November 16, 2004, she had significant paraspinal tenderness on the right, "some" trapezius tenderness, and "some" decreased range of motion on rotation (Tr. at 330). She did not have significant tenderness in her lumbar spine (Tr. at 330). Despite complaints of decreased sensation, Plaintiff's grip strength was normal (Tr. at 330). Dr. Harwell prescribed Plaintiff medication but did not place her on any restrictions (Tr. at 330). On April 19, 2005, Dr. Harwell noted Plaintiff appeared only minimally uncomfortable and had "a somewhat decreased range of motion" (Tr. at 509). She had significant cervical tenderness but only minimal tenderness in her lumbar spine; straight leg raises were negative (Tr. at 509). There is nothing other than Dr. Harwell's documentation of Plaintiff's subjective complaints to support his finding that Plaintiff could not sit or stand more than ten minutes, much less his ultimate disability determination (Tr. at 509). Consistent with the ALJ's determination that Plaintiff's subjective complaints were not credible, the ALJ properly gave little weight to Dr. Harwell's opinion.

In addition, other objective medical evidence of record is contrary to Dr. Harwell's opinion that Plaintiff is disabled. Plaintiff's May 25, 2005, CT scan was unremarkable (Tr. at 234-235). X-rays were consistently negative (Tr. at 107, 495, 615, 617-620, 666-667, 678, 680-682, 693, 694).

49

A July 14, 2004, echiocardiogram was normal (Tr. at 453). A July 12, 2004, MRI was "suspicious for very mild thoracic rotoscoliosis" (Tr. at 456), but subsequent MRIs conducted on September 18, 2005, and October 4, 2005, were unremarkable (Tr. at 581, 605). Plaintiff had normal Romeberg and finger-to-nose testing on December 19, 2002 (Tr. at 242). Straight leg raises were negative on April 16, 2005 and October 26, 2005 (Tr. at 509, 520). Furthermore, in diagnosing Plaintiff with chronic neck and back strain and painful joints, Dr. Ash noted the findings were basically subjective and did not feel she had measurable limitations based on objective evidence (Tr. at 280). Dr. DelaRosa diagnosed Plaintiff with gastroesophageal reflux symptoms, fibromyalgia, leg swelling, a headache, and chronic neck and back pain, but stated he was unsure why Plaintiff would be on disability (Tr. at 507). Plaintiff's motion for summary judgment is denied on this basis.

### B. RFC - Mental

The ALJ found that, due to Plaintiff's mental impairments, she had moderately limited functional capacity in the ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. at 26-27). Plaintiff was, however, able to: understand, remember, and carry out simple instructions; make judgments commensurate with conditions of unskilled work; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting (Tr. at 27).

Plaintiff argues the ALJ erred in relying on one-time consultative examiner Dr. Lutz's opinion in reaching this determination and should have, instead, given more weight to Nurse Corson's treatment notes and medical source statement. However, "[a] therapist is not an

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 50 of 52

'acceptable medical source' to establish 'a medically determinable impairment.'" Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). In instances where the record is comprised of opinions from an one-time consulting psychologist and a nurse, the ALJ may properly give more weight to the consulting psychologist's opinion. See Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).

In this case, Nurse Corson is not an acceptable medical source. The ALJ therefore properly gave less weight to her opinion and more weight to Dr. Lutz's opinion. Dr. Lutz's examination suggested Plaintiff exaggerated her profile (Tr. at 482). Additionally, the medical record of evidence supports the less restrictive limitations contained in Dr. Lutz's medical source statement. On January 27, 2004, Dr. Aram opined Plaintiff's impairments were severe but not expected to last twelve months, as he thought she would improve with continued medication and sobriety (Tr. at 261, 271). A review of the records shows that Plaintiff did, indeed, improve with medication (Tr. at 273, 423, 433). While medicated, Plaintiff maintained a GAF of 60, which indicates moderate symptoms (Tr. at 424, 426, 514, 516). Despite Nurse Corson's more restrictive medical source statement, she later recommended Plaintiff work part time and instructed her to undergo vocational rehabilitation to find employment (Tr. at 424, 427). Plaintiff's motion for summary judgment is, accordingly, denied on this ground.

## VI. VOCATIONAL EXPERT'S TESTIMONY

Plaintiff contends that the ALJ relied on faulty vocational expert testimony at step five of the sequential evaluation process. "A vocational expert's response to a hypothetical question provides substantial evidence where the hypothetical question sets forth with reasonable precision the claimant's impairments." Starr v. Sullivan, 981 F.2d 1006, 1008 (8th Cir. 1992). A properly formulated hypothetical question contemplates impairments "supported by substantial evidence in

the record and accepted as true by the ALJ"; it need not contain discredited complaints of pain. Guilliams, 393 F.3d at 804.

In this case, Mr. Lala's testimony that Plaintiff could perform a full range of sedentary ad partial range of light unskilled work is substantial evidence that Plaintiff is not disabled. The ALJ's hypothetical questions properly included the impairments he accepted as true and omitted those which he chose to discredit. Plaintiff's motion is denied on this ground.

### VII.  CONCLUSION

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 4, 2007

Case 6:06-cv-03305-REL   Document 15   Filed 09/04/07   Page 52 of 52